UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| THE CORDISH COMPANY and BAYOU PLACE LIMITED PARTNERSHIP <br><br> Plaintiffs, <br><br> v. <br><br> ACE PROPERTY AND CASUALTY INSURANCE COMPANY and THE OHIO CASUALTY INSURANCE COMPANY <br><br> Defendants. | Case No: _____ <br><br> **COMPLAINT** |

## PRELIMINARY STATEMENT

1.      This is a declaratory judgment action brought by Plaintiffs The Cordish Company ("Cordish") and Bayou Place Limited Partnership ("Bayou") (collectively, "Cordish-Bayou,") against their excess insurance companies Ace Property and Casualty Insurance Company ("Chubb") and The Ohio Casualty Insurance Company ("Liberty Mutual") (collectively, the "Excess Insurance Companies").

2.      Bayou manages and operates Bayou Place, a multi-faceted dining, entertainment and office property in downtown Houston, Texas.  What is now Bayou Place began as an urban renewal project that turned an unused convention center into an integral and thriving part of Houston's theatre district.

3.      The renovation and re-development of the property began with the construction of entertainment and dining properties in 1997, and concluded with the completion of commercial office space in 2006.

4.      After construction ended in 2006, Bayou contractually became the property manager for Bayou Place and since that time, its sole responsibility has been to operate and manage the property on behalf of its subtenants.

5.      This two-faceted approach to the Bayou Place project – development and construction followed by post-construction management and operations – is typical for such projects.  And the insurance that covers the risks associated with the two distinct facets of these operations follows suit.

6.      Project-specific builder's risk insurance policies were purchased to cover the risks associated with development and construction operations associated with the construction and renovation project – which concluded in 2006.

7.      Once operations began, the liability risks associated with the ownership, operation, and management of the property are covered under general liability policies that specifically name Cordish-Bayou as an additional insured.

8.      The primary layer of that general liability insurance was purchased from Endurance American Specialty Insurance Company ("Sompo"), bearing policy number GGR10010248100 and covering the period from November 26, 2016 through February 15, 2018 (the "Primary Policy").  The Primary Policy provides a $1 million policy limit and covers defense costs outside that limit.  A copy of the Primary Policy is attached hereto as Exhibit A. Sompo has provided coverage for the claim at issue and is not a party to this lawsuit.

9.      Defendant Chubb sold an umbrella insurance policy bearing policy number M00593825 003 (the "Chubb Policy") with a $50 million policy limit that applies excess to, and follows form to the terms of, the Primary Policy.

10.    Defendant Liberty sold an excess general liability policy bearing policy number ECO (17) 56243759 (the "Liberty Policy") with a policy limit of $50 million, which applies excess to and follows form to the terms of the Chubb Policy.

11.    In September 2017, while these general liability policies were in place, Norberto Valles and Undrea Bailey were severely injured in a flash electrical explosion (the "Accident") while making a non-structural repair to electrical equipment at Bayou Place in an electrical room controlled and managed by Bayou.

12.    Thereafter, Mr. Valles (as plaintiff) and Mr. Bailey (as intervenor) sued a series of parties, including Cordish-Bayou, in an action captioned *Norberto Valles v. CenterPoint Energy, Inc. et al.*, Case No: 2017-72382, 129th District Court, Harris County, Texas (the "*Valles/Bailey* Action").

13.    Messrs. Bailey and Valles allege, *inter alia*, that Cordish-Bayou was negligent in maintaining a safe premises, inspecting or repairing equipment, and/or providing adequate safety equipment or hazard warnings.

14.    The allegations made and liability claimed in the *Valles/Bailey* Action are covered under the general liability insurance purchased from Sompo, Chubb and Liberty.

15.    Sompo, Chubb and Liberty were given timely notice of the *Valles/Bailey* Action.

16.    Sompo agreed that the claim is covered and has defended Cordish-Bayou in the *Valles/Bailey* Action.

17.    Chubb and Liberty were active in the defense of the *Valles/Bailey* Action as well. Consistent with the terms of the Chubb Policy, Chubb and Liberty assigned claims handlers that

3

assisted in the defense of the *Valles/Bailey* Action and retained and paid for monitoring counsel that assisted in that defense.

18.     After monitoring the *Valles/Bailey* Action for years, the Excess Insurance Companies now assert, on the eve of an October 2023 trial in the *Valles/Bailey* Action, that coverage under the Excess Policies is "unlikely" because of a "Construction Operations Exclusion" endorsement in the Chubb Policy.

19.     The Construction Operations Exclusion Endorsement does not limit coverage for the *Valles/Bailey* Action.

20.     That exclusion merely restricts coverage for risks associated with construction operations, which are typically covered under builder's risk policies as noted above. Construction operations at Bayou Place ended in 2006 and the risks involved in 2017, including the Accident that gave rise to the *Valles/Bailey* Action, arose out of the management and operation of the property, not construction operations.

21.     Indeed, if there is an endorsement in the Chubb Policy that is relevant to the *Valles/Bailey* Action, it is the "ACE Specialty Suite – Real Estate Industry Endorsement," which expressly *extends* coverage for allegations regarding non-structural repair and maintenance performed in connection with Cordish-Bayou's operations as a real estate manager, owner, or operator – specifically including allegations regarding sequences and procedures used during non-structural repairs at the property.

22.     Because the Excess Insurance Companies are wrongfully attempting to escape their coverage obligations with respect to the *Valles/Bailey* Action, Cordish-Bayou seeks a

declaratory judgment that the Excess Insurance Policies provide coverage for the *Valles/Bailey* Action.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity among the parties and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

24.     An actual controversy exists between Plaintiffs and Defendants regarding the coverage owed under the Excess Insurance Policies.  Thus, this Court has jurisdiction over the Plaintiffs' claims for declaratory relief under 28 U.S.C. § 2201 because an actual controversy ripe for judicial determination exists between Plaintiffs and Defendants.

25.     Venue is proper within this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, because Plaintiffs are located in this judicial district and Defendants generally transact business in this district and within the State of Maryland.

## THE PARTIES

26.     Plaintiff The Cordish Company is organized under the laws of the State of Maryland with a principal place of business in Maryland.  The Cordish Company is a named insured under the Primary Policy sold by Sompo, and under the Excess Insurance Policies.

27.     Plaintiff Bayou Place Limited Partnership is organized under the laws of the State of Maryland with a principal place of business in Maryland.  Bayou Place, Limited Partnership is a named insured under the Primary Policy sold by Sompo and under the Excess Insurance Policies.

28.     Upon information and belief, Defendant Ace Property and Casualty Insurance Company is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

29.     Upon information and belief, The Ohio Casualty Insurance Company is a New Hampshire corporation with its principal place of business in Boston, Massachusetts.

## FACTUAL BACKGROUND

**A.     The Insurance for Management Operations at Bayou Place**

30.     As noted above, the risks associated with development and construction operations at Bayou Place were insured under project-specific builder's risk insurance policies purchased to cover the construction and renovation project during the time prior to 2006 when such construction was ongoing.

31.     Liability risks associated with the ownership, operation, and management of the property once it was built are insured under the Primary Policy purchased from Sompo and the Excess Insurance Policies purchased from Chubb and Liberty.

32.     The Chubb Policy includes a Construction Operations Exclusion Endorsement that provides, in relevant part:

> This insurance does not apply to:
>
> **Construction Operations**
>
> Any liability, "loss", cost, expense, demand, claim or "suit" arising out of the construction, renovation, rehabilitation, demolition, excavation, remediation or landscaping of any building, property or structure. . . .

Chubb Policy, Endorsement No. 8, Construction Operations Exclusion.

6

33.     The Construction Operations Exclusion Endorsement restricts coverage for risks associated with the construction operations aspect of the project – which risks are covered under builder's risk policies and other blanket coverage placed during construction operations.

34.     As relevant here, such construction operations ended at Bayou Place in or about 2006.

35.     Chubb admitted to Maryland insurance regulators that the Construction Operations Exclusion, Form No. XS-30048 (07/10), applies to "construction operations."

36.     There was no reason or opportunity to seek out or place builder's risk coverage for the repairs that were being performed at the time of the September 2017 Accident that gave rise to the *Valles/Bailey* Action.

37.     Chubb's Policy also includes an ACE Specialty Suite – Real Estate Industry Endorsement, which includes an extension of coverage titled "Construction (Means and Methods) Professional Services Coverage." That endorsement provides in relevant part:

> **Construction (Means and Methods) Professional Services Coverage**
>
> With respect to your "real estate operations", this insurance applies to "bodily injury" and "property damage" caused by an "occurrence" and arising out of construction related services performed by you in the course of non-structural renovation, repair and maintenance, including the means, methods, techniques, sequences and procedures employed by you in connection with your operations as a real estate manager, owner or operator.

Chubb Policy, Endorsement No. 4 "ACE Specialty Suite – Real Estate Industry Endorsement," at 2.

38.     The endorsement defines "real estate operations" as:

7

> ownership, management or maintenance of premises, and
> operations on the premises or elsewhere which are necessary or
> incidental to the ownership, management or maintenance of such
> premises.

*Id.* at 7.

39.     The Liberty Policy follows form to the Chubb Policy, and attaches in excess of the $50 million Chubb Policy and the $1 million Sompo Primary Policy.  Liberty Policy, Declarations, Item 4, "Limits of Insurance"; *id.*, Following Form Endorsement.

40.     The Chubb Policy and the Liberty Policy were purchased through an insurance broker – Lockton Companies LLC ("Lockton") – via Lockton's office in Los Angeles, California.

41.     The premiums for the Chubb Policy and the Liberty Policy were paid by check sent from Baltimore, Maryland to Lockton's office in Los Angeles, California.

42.     The Chubb Policy and the Liberty Policy were delivered by Chubb and Liberty, respectively, to Lockton's office in Los Angeles, California.

**B.     The Development and Subsequent Management of Bayou Place**

43.     In 1991, a limited partnership affiliated with the Cordish family (the 500 Texas Avenue Limited Partnership) entered a 60-year lease with the City of Houston in which it was authorized to: (1) develop and improve the then-vacated Albert Thomas Convention Center and (2) sublease the developed and improved space to subtenants.

44.     Phase I of the project regarding the renovation of the Convention Center was completed in 1997, opening a thriving dining and entertainment district.

45.     In 2006, the project was expanded to include a second phase – construction of a major office component completed that year – which has proved a great success and additional economic driver for the City of Houston.

46.     In 2006, Bayou was assigned the rights and responsibility for operating Bayou Place, and its sole responsibility at Bayou Place has been to operate and manage the non-office portion of the property on behalf of its subtenants.

47.     As of August 2017, the only Bayou employees working at Bayou Place were Property Manager Gary Rhodes and his staff of approximately three custodial workers.

48.     Mr. Rhodes and his team were responsible for general labor such as picking up trash, blowing leaves, power washing, killing weeds, checking for leaks, painting, and effecting basic or temporary repairs, as well as retaining third-party contractors to perform other maintenance and repair work as needed.

**C.     The Accident**

49.     On August 23, 2017, the parking garage beneath Phase I of Bayou Place – which is owned and operated by the Houston First Corporation (a corporate entity owned by and for the benefit of the City of Houston) – was inundated by floodwaters during Hurricane Harvey.

50.     The floodwaters also inundated the electrical room located within the parking garage (the "Electrical Room"), which is controlled and operated by Bayou pursuant to the lease with the City of Houston.

51.     Bayou was responsible for making repairs in the Electrical Room necessitated by the floodwater.

52.     In an effort to restore power to the AMC / Sundance Movie Theater, Bayou spoke with Mr. Bailey on or about September 13 or 14, 2017 about replacing an electronic trip circuit breaker in the Electrical Room.  This was the sole task that Mr. Bailey was asked to perform.

53.     The selection of Mr. Bailey to perform this work arose because he happened to be nearby when Mr. Rhodes was looking to restore power to the movie theater.  After Mr. Rhodes was put in touch with Mr. Bailey, Mr. Bailey visited the Electrical Room, accompanied by Bayou Place personnel, communicated with Mr. Rhodes regarding costs for the work, and received a replacement breaker from Bayou Place, which Mr. Bailey took to a third party for inspection.

54.     There was no overarching plan for all repairs at Bayou Place, or even just in the Electrical Room, when Bayou retained Mr. Bailey to replace the breaker.

55.     On September 16, 2017, Messrs. Bailey, Valles and an apprentice (Tom Dupnik) carried the replacement breaker and their tools from Bailey's truck to the Electrical Room.  After Mr. Bailey tested the power lines connected to the breaker, which revealed a power reading, Valles proceeded to remove the A and B lines from the secondary side of the breaker using the ratchet and wrench.  Mr. Bailey, after leaving the room for a short time, positioned himself in front of the breaker and proceeded to disconnect or attempted to disconnect the C phase line from the bottom of the breaker.  Shortly thereafter, Messrs. Valles, Bailey and Dupnik experienced a bright flash and sudden heat, which multiple witnesses in the underlying action have described as an "arc flash" or explosion, which expelled molten copper.

56.     The molten copper expelled during the arc flash struck Mr. Bailey in the face, upper body, and waist.  This resulted in severe burns to his eyelids, face, neck, chest, arms, legs, back, and other parts of his body.  Mr. Bailey was placed in a medically induced coma for three

weeks.   Medical records submitted by Mr. Bailey indicated he spent over two months in the hospital immediately following the Accident, where he was subject to numerous surgeries, including procedures for skin grafts, scar release, and nose and lip reconstruction.

57.     Mr. Valles also suffered severe injuries during the Accident, including severe burns to his face, neck, chest, left arm, legs, and back, and injuries to his lungs and other parts of his body.  Mr. Valles was also placed in a medically induced coma for three weeks.

**D.     The *Valles/Bailey* Action**

58.     On or around October 26, 2017, Mr. Valles filed his Original Petition in the *Valles/Bailey* Action, alleging negligence per se and gross negligence claims against several entities that purportedly were operating at Bayou Place at the time of the Accident.

59.     In May 2018, Mr. Bailey (along with his son and fiancé) intervened in the *Valles/Bailey* Action.

60.     On July 16, 2018, Mr. Valles filed his Second Amended Petition, adding The Cordish Company to the suit.

61.     On April 2, 2018, Mr. Valles non-suited all claims against The Cordish Company.

62.     On April 30, 2019, Mr. Valles reasserted a negligence claim against The Cordish Company, through his Tenth Amended Petition (the "Operative Underlying Complaint").  A true and correct copy of the Operative Underlying Complaint is attached hereto as Exhibit B.

63.     Messrs. Bailey and Valles each allege that: (i) they sustained severe injuries while working on property managed by Cordish-Bayou; (ii) their injuries were proximately caused by Cordish-Bayou's allegedly negligent maintenance of a safe premises; and, consequently, (iii) they are allegedly entitled to damages (including exemplary damages).

64.     Mr. Valles alleges Cordish-Bayou managed Bayou Place at the time of the Accident (*id.* at ¶¶ 14–15), and that Cordish-Bayou acted negligently, negligent per se, and/or grossly negligent by:

   a.   failing to properly supervise their crew;
   b.   failing to properly train their employees;
   c.   failing to provide adequate safety equipment;
   d.   failing to provide adequate means of ingress and egress;
   e.   failing to provide a safe premises;
   f.   failing to lock out and tag out known dangerous equipment;
   g.   failing to maintain a safe premises;
   h.   failing to warn of safety hazards and/or remedy the hazards;
   i.   failing to remedy hazards and/or defects on the premises;
   j.   failing to de-energize known electrical hazards;
   k.   failing to inspect, maintain, and/or repair their equipment;
   l.   failing to exercise reasonable care in carrying out duties that they voluntarily undertook to perform;
   m.   failing to comply with applicable safety standards, regulations and practices; and
   n.   other acts deemed negligent.

*Id.* at ¶ 17 (subparagraphs "a"–"l," "o"–"p").

65.     Mr. Valles further alleges Cordish-Bayou's negligence, negligence per se, and/or gross negligence renders Cordish-Bayou: (a) "vicariously liable for their employees' negligence"; and (b) "liable as principles [sic] for the negligence of their agents." *Id.* at ¶ 17 (subparagraphs "m" and "n").

66.     Mr. Valles further alleges he suffered serve bodily injury that in "all reasonable certainty" will continue indefinitely (*id.* at ¶ 18), and seeks damages (including exemplary damages (*id.* at ¶ 19)) in excess of $1,000,000 (*id.* at Section VII, Prayer).

67.     Mr. Bailey asserts similar allegations in his Fifth Amended Intervenor Complaint. *See, e.g.,* ¶¶ 5.1 and 5.4 (alleging Cordish-Bayou "managed" the property wherein Mr. Bailey was injured); ¶ 6.1 (alleging the "negligence, carelessness, recklessness, and gross negligence" of all underlying defendants proximately caused Bailey's damages, and listing fifteen subparagraphs describing certain offending actions); ¶¶ 7.3–7.4 (listing damages allegedly sustained by Bailey and his co-intervenors); ¶ 8.1 (alleging entitlement to exemplary damages). Mr. Bailey's Fifth Amended Intervenor Complaint is attached here as Exhibit C.

**E.     The Insurance Claim and Recent Coverage Dispute**

68.     Sompo, Chubb and Liberty were provided with timely notice of the *Valles/Bailey* Action (the "Claim").

69.     Sompo agreed that the Claim is covered and has defended Cordish-Bayou against the allegations in the *Valles/Bailey* Action.

70.     Consistent with the terms of the Chubb Policy, Chubb and Liberty assigned claims handlers and retained counsel to monitor and assist in the defense of the *Valles/Bailey* Action.

71.     On July 22, 2019, Chubb sent a reservation of rights letter to Cordish-Bayou.  A true and correct copy of Chubb's July 22, 2019 Letter is attached as Exhibit D.

72.     In its July 22, 2019 Letter, Chubb asserted "[t]he available information indicates" Bailey and Valles's injuries arose out of the "renovation, alteration, improvement, and rehabilitation of the building" to its pre-Hurricane Harvey state, which could implicate the Construction Operation Exclusion.  Exhibit D, at 2–3.

73.     From approximately 2019 to 2023, Chubb and Liberty continued to pay for counsel and use their claims adjusters to monitor and assist in the defense of the *Valles/Bailey* Action.

74.     Liberty acknowledged the Claim in 2018 but did not reserve its right in 2018, 2019, 2020, 2021 or 2022 to raise any coverage defenses.

75.     On March 22, 2023, Chubb sent a letter regarding its coverage position, repeating its assertion that the Accident might have arisen out of "renovation, alteration, improvement, and rehabilitation" at the property, which could implicate the Construction Operation Exclusion.  A true and correct copy of Chubb's March 22, 2023 Letter is attached as Exhibit E.

76.     On May 1, 2023, Chubb sent another letter, in which it stated for the first time that the work performed by Messrs. Bailey and Valles was "part of a larger reconstruction project" consistent with "remediation" at Bayou Place.  A true and correct copy of Chubb's May 1, 2023 Letter is attached as Exhibit F.

77.     On May 15, 2023, Liberty issued its first reservation of rights letter, a true and correct copy of which is attached as Exhibit G.   Liberty, for the first time, asserted that Messrs. Bailey and Valles's work was "part of a larger reconstruction, remediation, and rehabilitation effort to address extensive damage caused by flooding from Hurricane Harvey."  *Id.*  Liberty, for the first time, contended the Construction Operations Exclusion barred coverage, asserting that "[t]he work being performed by [Messrs. Bailey and Valles], which resulted in their claimed damages, was part of a larger reconstruction project, involving multiple contractors, and comprised rehabilitation and remediation of the building, property or structure at issue." *Id.* at 5.

78.     In letters dated May 23, 2023 (Chubb) and June 5, 2023 (Liberty), Chubb and Liberty reiterated their contention that the Construction Operations Exclusion bars (or likely bars) indemnity coverage for the Claim.

79.     In short, Chubb and Liberty took the position in their recent correspondence that the electrical work performed by Messrs. Bailey and Valles was part of a larger "reconstruction" project overseen by a contractor (Gilbane) that was performing pump-out work for Houston First in the garage and amounted to the "rehabilitation" or "remediation" of Bayou Place.

80.     Chubb and Liberty's recent coverage positions are undermined by the terms of their policies and the facts regarding the work performed at Bayou Place leading up to the Accident.

81.     Contrary to the Excess Insurance Companies' new position, Gilbane had nothing to do with the hiring of Messrs. Bailey and Valles or the direction of the work they performed. Gilbane did not hire Messrs. Bailey and Valles, did not recommend them to Bayou for hiring, and did not identify the breaker as an item for remedial work at the time of the Accident.

82.     Gilbane was not hired by Bayou to work on property managed by Bayou until several weeks **after** the Accident.  Gilbane's Safety Director testified in March of 2019 that prior to September 16, 2017, Gilbane was not involved in any "remediation" that involved electrical work and Gilbane never stepped foot in the Electrical Room.  Indeed, Gilbane did not begin work for Bayou until mid-October 2017.

83.     Far from being a part of a coordinated "remediation" effort being spearheaded by Gilbane, multiple witnesses have testified that the selection of Messrs. Bailey and Valles to replace the breaker involved a certain amount of happenstance.

84.     The replacement of the breaker that resulted in the Accident was a non-structural repair at property managed by Bayou, separate from the work performed by Gilbane for Houston First Corporation at that time.  The Gilbane work for Houston First Corporation was performed by unrelated personnel at a different time and place than the electrical work performed for Bayou by Messrs. Bailey and Valles.

85.     With the assistance of a mediator, the parties to the *Valles/Bailey* Action, along with Sompo and the Excess Insurance Companies, have been engaged in discussions for over a year regarding a possible resolution of the *Valles/Bailey* Action.

86.     The first mediation session was held in late August, 2022.  Sompo tendered its policy limit towards the settlement of the *Valles/Bailey* Action, and Chubb stated that it needed more time to assess the value of the tort plaintiffs' claims, but did not mention its July 2019 reservation of rights being a barrier to settlement.

87.     It was not until May and June 2023 – just before the second mediation session scheduled for June 2, 2023 – that Chubb or Liberty asserted that any coverage defense presented an issue with respect to their funding of a settlement.

88.      The new coverage stance taken by the Excess Insurance Companies in May and June 2023 forced the adjournment of that second mediation session.

89.     Cordish-Bayou, with the assistance of its insurance broker, repeatedly urged the Excess Insurance Companies to reconsider their recently hardened coverage position, agree to participate in a rescheduled mediation and fund a reasonable settlement of the *Valles/Bailey* Action within their policy limits should such a settlement opportunity arise during mediation.

90.     Upon information and belief, those requests were presented for consideration by senior management at Chubb, including the company's President, John Lupica.  Following internal discussions at Chubb, Cordish-Bayou's insurance broker was told that Chubb was "dug in" on its current coverage position.

91.     Thus, contrary to the terms of the Chubb Policy, the nature of Messrs. Bailey and Valles's work, and Chubb's own regulatory filings, Chubb and Liberty have refused to reconsider the coverage stance they have adopted over the past few months.

92.     The coverage positions raised by Chubb and Liberty on the eve of the October 2023 trial constitute a significant, actual controversy with Cordish-Bayou regarding coverage for the *Valles/Bailey* Action that threatens to derail a years-long effort to mediate and settle the underlying action.

**F.     The Excess Insurance Companies' Recent Bad Faith Conduct**

93.     It is an unfair claim settlement practice for an insurance company to: (1) misrepresent pertinent facts or policy provisions that relate to any coverages at issue; or (2) not attempt in good faith to effectuate a prompt, fair and equitable settlement of claims in which liability has become reasonably clear.

94.     Chubb and Liberty have been monitoring the defense of the *Valles/Bailey* Action for years, yet it was not until the eve of the October 2023 trial that they sought to substantially alter their coverage positions – based on details known to them for years – in a wrongful, self-serving, last-minute effort to avoid their coverage obligations.

95.     Mr. Bailey has made a settlement demand to resolve his claims in the *Valles/Bailey* Action for an amount less than the limits of the Chubb and Liberty Policies.

96.     Chubb and Liberty have wrongfully avoided and breached their contractual and common law duty to attempt in good faith to effectuate a prompt, fair and equitable settlements of such claims.

97.     Sompo paid Cordish-Bayou's defense counsel (Wilson Elser, LLP), and Wilson Elser represented Cordish-Bayou, not Sompo or the Excess Insurance Companies.  That said, the Excess Insurance Companies interacted with Wilson Elser as part of their assistance in the defense of the *Valles/Bailey* Action.

98.     Starting in May 2023, Liberty personnel tried to exploit their relationship with Wilson Elser in an attempt to find support for their last-minute revisions to their coverage positions.  The information that the Excess Insurance Companies sought from Wilson Elser was not relevant to Cordish-Bayou's defense in the *Valles/Bailey* Action, and seemed instead designed to manufacture support for the Excess Insurance Companies' new arguments regarding coverage.

99.     Liberty approached Wilson Elser directly about these matters without Cordish-Bayou's knowledge and without seeking or obtaining Cordish-Bayou's consent.

100.     In response, Wilson Elser noted the information Liberty asked for was not germane to the litigation or defense of the tort case, appeared to target coverage issues, and that the request raised ethical issues governing the tripartite relationship.

101.     Although Chubb did issue a reservation of rights letter in 2019, noting that Messrs. Valles and Bailey's work might amount to a "renovation" or "rehabilitation" that might implicate the Construction Operations Exclusion, Chubb nevertheless indicated through its conduct that it was covering the Claim, and spent significant sums on separate counsel that actively assisted in the defense of the *Valles/Bailey* Action.  It is only now, on the eve of trial,

that Chubb is trying to raise new coverage arguments in a last-minute pivot aimed at avoiding its coverage obligations.

102.    Liberty failed to raise a single coverage defense for over four years and yet is trying to avoid its coverage obligations only now, on the eve of trial.

103.    Chubb and Liberty are putting their own interests ahead of their policyholders' interests, in violation of the implied covenant of good faith and fair dealing and applicable law.

## CLAIM FOR RELIEF

### COUNT I - DECLARATORY JUDGMENT
### (Coverage Under the Excess Insurance Policies)

104.    Cordish-Bayou repeat and reallege paragraphs 1 through 103 of the Complaint as if full set forth herein.

105.    Cordish-Bayou seek a declaratory judgment to determine a question of actual controversy between the parties regarding the Excess Insurance Policies.

106.    The Excess Insurance Companies have refused to reconsider their coverage position that the Construction Operations Exclusion bars coverage for indemnity of the *Valles/Bailey* Action.

107.    By reason of the foregoing, an actual and justiciable controversy exists between Cordish-Bayou and the Excess Insurance Companies regarding the insurance companies' obligation to cover the Claim.

108.    Cordish-Bayou are entitled to a judicial determination by this Court that the Excess Insurance Companies have no grounds to deny coverage, whether on the Construction Operations Exclusion or otherwise.

## COUNT II – BAD FAITH
## (<u>Breach of the Duty of Good Faith and Fair Dealing</u>)

109.     Cordish-Bayou repeat and reallege paragraphs 1 through 108 of the Complaint as if full set forth herein.

110.     By wrongfully denying insurance coverage based upon frivolous arguments and by adopting coverage positions in furtherance of their own financial interests and in detriment to Cordish-Bayou's interests, the Excess Insurance Companies engaged in affirmative misconduct that was arbitrary, capricious, dishonest, malicious, oppressive and fraudulent.

111.     The Excess Insurance Companies breached the implied covenant of good faith and fair dealing by refusing to negotiate and fund a settlement within their policy limits concerning the underlying claims alleged by Mr. Bailey.  The Excess Insurance Companies' bad faith conduct has thus placed Cordish-Bayou in danger of suffering an adverse judgment in excess of the Chubb and Liberty Policy limits.  As a result of their bad faith conduct, the Excess Insurance Companies will be responsible to indemnify Cordish-Bayou completely against any judgment it incurs concerning the claims by Mr. Bailey in the *Valles/Bailey* Action, without regard to the limits of the Chubb and Liberty Policies.

112.     The Excess Insurance Companies misrepresented policy provisions in asserting that the Construction Operations Exclusion bars coverage for the Claim, and that the Real Estate Industry Endorsement does not afford coverage for the Claim.  Such misrepresentations are most evident, for example, from the fact that the Excess Insurance Companies take the position that the Claim involves "renovation" for purposes of the exclusion, but does not involve "renovation" for purpose of the coverage extension.

113.    Cordish-Bayou has been damaged by the Excess Insurance Companies' bad-faith conduct, including by the Excess Insurance Companies' misrepresentations of policy provisions and the Insurance Companies' failure to reasonably settle the underlying claims within their policy limits.

114.    The bad faith acts of the Excess Insurance Companies were committed knowingly and willfully with malice, oppression, fraud and ill will, and were intentionally intended to injure Cordish-Bayou, thereby entitling Cordish-Bayou to punitive damages.  The Excess Insurance Companies' conduct was performed with actual awareness of the unfairness of the conduct with conscious indifference to the rights of Cordish-Bayou.

115.    The Excess Insurance Companies' wrongful acts, as set forth herein were committed intentionally, with the knowledge, authorization, and ratification of their corporate management, and were willfully designed to injure Cordish-Bayou by depriving it of known insurance benefits.  When such wrongful acts were committed, each of the Excess Insurance Companies, and their corporate management, knew that such acts were taking place, knew that such acts were wrong and illegal, knew that such acts would cause Cordish-Bayou severe financial injury, and knew that such acts were in conscious disregard of Cordish-Bayou's rights under the Chubb and Liberty Policies.

116.    At the time the Policies were sold, it was reasonably foreseeable that bad faith conduct such as occurred here was likely to result in consequential damages of the sort that Cordish-Bayou has suffered as a direct and proximate result of the Excess Insurance Companies' bad-faith conduct.

117.    As a direct and proximate result of the Excess Insurance Companies' bad-faith conduct, the Excess Insurance Companies are liable to Cordish-Bayou for damages, the exact

amount to be proven at trial, including but not limited to compensatory, consequential and punitive damages, attorneys' fees and costs, and pre- and post-judgment interest.

## REQUESTS FOR RELIEF

WHEREFORE, Cordish-Bayou respectfully request that this Court enter judgment against Defendants as follows:

(a) Enter declaratory judgment on Count I in favor of Cordish-Bayou and against Chubb and Liberty, including a declaration that the Chubb Policy and the Liberty Policy cover the Claim; reasonable costs, attorneys' fees, and expenses incurred by Plaintiffs for this action; and pre-judgment and post-judgment interest, as provided by law;

(b) Enter judgment on Count II in favor of Cordish-Bayou and against Chubb and Liberty awarding compensatory damages, consequential damages, punitive damages, pre- and post- judgment interest thereon and attorneys' fees and costs in an amount to be determined; and

(c) For such other and further relief, including attorneys' fees, costs, disbursements, and expenses incurred for this action, in favor of Cordish-Bayou and against Chubb and Liberty, as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

Dated:  July 27, 2023

**ANDERSON KILL P.C.**

By:  _/s/ Rhonda Orin_
      Rhonda D. Orin, Esq.
      1717 Pennsylvania Avenue, NW Suite 200
      Washington, DC 20006
      (202) 416-6500
      rorin@andersonkill.com

      Marshall Gilinsky, Esq.
      (application for admission pending)
      1251 Avenue of the Americas
      New York, New York 10020
      (212) 278-1000
      mgilinsky@andersonkill.com